IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT OF THE
STATE OF FLORIDA, IN AND FOR LAKE COUNTY
GENERAL CIVIL DIVISION

INEZ SPIGNER, *on behalf of herself and*
*all individuals similarly situated,*                                    CASE NO.

      Plaintiff,

v.

W6LS, INC., d/b/a WITHU LOANS, and
CALIBER FINANCIAL SERVICES, INC.,

      Defendants.

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Inez Spigner ("Plaintiff"), individually and on behalf of all individuals similarly situated, through counsel, brings this action against Defendants W6LS, Inc, d/b/a WithU Loans ("WithU") and Caliber Financial Services, Inc. ("Caliber") (collectively "Defendants") for damages, declaratory relief, and injunctive relief, and alleges as follows:

## NATURE OF THE ACTION

1.     This case is about the making and collection of unlawful loans by WithU—a predatory "tribal lending entity that is wholly-owned by the Otoe-Missouria Tribe of Indians."[1] These loans are for relatively small amounts of money and are often saddled with triple-digit interest rates. Loans of this nature are unlawful in many states, including Florida, where Ms. Spigner resides.

---

[1] https://www.withuloans.com/ (last accessed November 28, 2023).

FILED: LAKE COUNTY, GARY J. COONEY, CLERK, 12/04/2023 03:53:56 PM

2.      The short-term, usurious loans provided by Withu are designed to take advantage of vulnerable borrowers. Left unregulated, they create a cycle of mounting debt.

3.      Florida State law is designed to protect at-risk borrowers. The Florida Bar's Handbook to Practice Under Florida Usury Law explains that "[t]he theory and purpose of usury statutes have been based upon the borrower's precarious position when in need of money." Wyatt Martin, Jarret C. Oeltjen, Anthony Dogali, *Introduction to Usury Law*, Section 1.12, PRACTICE UNDER FLORIDA USURY LAW, (The Florida Bar 2006). The Supreme Court of Florida highlighted this longstanding purpose in *Pushee v. Johnson*:

> The theory upon which laws against usury have been enacted, and the principle which has governed in their interpretation, have always been, that the borrower was at the mercy of the lender and subject to his utmost exactions and avaricious demands, unless protected by laws . . . . It is to shield from the grasp of the lender, and save the borrower from the injurious consequences of his own weakness and inability, that such statutes have been passed.

123 Fla. 305, 166 So. 847, 849 (1936) (citation omitted).

4.      Certain lenders attempt to circumvent legal protections like Florida's in order to further their usurious business model. In the "most recent incarnation of payday lending regulation-avoidance," lenders claim to be owned and operated by a Native American tribe to "gain the benefit of tribal sovereign immunity and avoid state usury laws, small loan regulations, and payday loan laws." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 753 (2012). The connection between Native American tribes and internet payday lenders are frequently tenuous at best. *See id.* at 784–85.

5.      Plaintiff brings this class action on her own behalf, and on behalf of a class of all persons who obtained WithU loans in Florida, to recover all amounts collected by Defendants and for damages, attorneys' fees, and such other relief as allowed by law. Plaintiff also seeks

2

declaratory and injunctive relief including a declaration that the loans are void, for refunds, and

for correction of all affected credit reports of class members.

6.      Within this class action against Defendants WithU and Caliber, Ms. Spigner alleges

violations of Florida's *Interest and Usury Statute*, Fla. Stat. § 687.01, *et seq.*; the Florida *Deceptive

and Unfair Trade Practices* Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA"); and the *Racketeer

Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("RICO").


## JURISDICTION AND VENUE

7.      The Court has original jurisdiction because this is a civil dispute involving more

than $50,000 in aggregate.

8.      Pursuant to Fla. Stat. § 48.193, the Defendants are subject to the jurisdiction of this

Court.

9.      Venue is proper because the cause of action accrued in Lake County, Florida. Fla.

Stat. § 47.051.


## PARTIES

10.     Ms. Spigner is a natural person currently residing in Davenport Florida, Polk

County.

11.     At the time Ms. Spigner entered into her loan agreement with WithU, she resided

in Clermont Florida, Lake County.

12.     Defendant W6LS, Inc, d/b/a WithU Loans claims to be an "arm of the Otoe-

Missouria Tribe of Indians, a federally recognized Indian Tribe and Sovereign Nation" (the

3

"Tribe").[2] Further, WithU claims to be owned and operated by the Tribe, which is headquartered in Red Rock, Oklahoma. The tribal jurisdictional area is in Noble and Kay Counties.

13.     WithU operates an online lending website, www.withuloans.com, which makes loans at triple-digit interest rates to consumers in many states, including Florida. According to the website, WithU's office is located at 8151 Hwy 177, Red Rock, OK 75651-0348. However, the website also directs mail correspondence to 10600 S. Pennsylvania Ave., Ste 16 #828, Oklahoma City, OK 73170-4257. On information and belief, this second address is a rented UPS Store mailbox.

14.     Defendant Caliber Financial Services, Inc. is "a tribally-chartered corporation and wholly owned by the Otoe-Missouria Tribe of Indians. Caliber provides professional portfolio management services to lenders including the Tribe's consumer lending portfolios."[3]

15.     According to its website (www.caliberfs.com), Caliber's address is 1611 S. Utica Ave., #527, Tulsa OK 74104-4909. On information and belief, this is also a rented UPS Store mailbox, and Caliber's principal place of business is in Overland Park, Kansas. (*See* job listing for executive administrative assistant that requires presence in Overland Park office to assist CEO and the Executive Team, attached as **Exhibit A**).

## FACTUAL BACKGROUND

**A.  WithU's Unlawful Loan to Plaintiff:**

16.     On or near January 26, 2023, Defendant WithU Loans made a $600 loan to Ms. Spigner (the "Loan"). *See* **Exhibit B**.

---

[2] https://www.withuloans.com/terms (last accessed November 28, 2023).
[3] https://www.caliberfs.com/about (last accessed November 28, 2023).

17.     Ms. Spigner applied for the Loan online through WithU's website.

18.     Her first payment was due February 2, 2023.

19.     The Loan has a stated annual percentage rate of 498.63%. *Id.* The per annum interest rate on the Loan is approximately 379%.

20.     Even with timely payments, the total amount paid—over a nine-month period, on a $600 Loan—would be $2,308.37. Ms. Spigner's final payment was due on October 26, 2023. *Id.*

21.     On or about January 26, 2023, the Loan proceeds were transferred into Ms. Spigner's bank account, which she maintained in Florida.

22.     Ms. Spigner contends that the terms of the Loan must conform with the laws of the State of Florida, because: (1) Ms. Spigner acquired the Loan from WithU from her home, located in Florida; (2) the proceeds were transferred to Ms. Spigner's bank account in Florida; and (3) Ms. Spigner received collection correspondence in Florida.

23.     The State of Florida has a history of limiting predatory lending and protecting vulnerable borrowers.

24.     Chapter 687 of the Florida Statutes, "Interest and Usury; Lending Practices," provides several important prohibitions related to Ms. Spigner's Loan and other similar loan agreements between WithU and Florida residents.

25.     Under Fla. Stat. § 687.02, contracts for the payment of interest on any loan at greater than 18% per annum simple interest are usurious.

26.     Loans made with an annual interest rate greater than 45% constitute a third-degree felony. Fla Stat. § 687.071(3).

27.     Furthermore, any criminally usurious loan is void and unenforceable. Fla. Stat. § 687.071(7).

28.     A person that willfully makes a loan of this nature forfeits the right to collect any payments because such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 125 Fla. 199, 169 So. 750, 758–59 (1935); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *Stubblefield v. Dunlap*, 148 Fla. 401, 4 So. 2d 519, 521 (1941) ("We feel that it is entirely proper for us to bear in mind not only the letter but the spirit of the usury law and its prime purpose to protect needy borrowers by penalizing unconscionable money lenders."); *River Hills, Inc. v. Edwards*, 190 So. 2d 415, 423 (Fla. Dist. Ct. App. 1966); *Rollins v. Odom*, 519 So. 2d 652, 657 (Fla. Dist. Ct. App. 1988).

29.     According to the Better Business Bureau's website, WithU has a "pattern of complaints concerning service issues including unauthorized and not acquired loans being deposited into consumers accounts and also having relatively high interest rates."[4]

30.     WithU's issuance and collection of the Loan to Ms. Spigner constitutes a felony pursuant to Fla. Stat. § 687.071(3).

**B. Rent-A-Tribe Schemes:**

31.     The Otoe-Missouria Tribe is a federally recognized Native American Tribe in Oklahoma.[5] WithU's website claims it is a lending entity owned and operated by the Tribe.

32.     In practice, the ties between the Tribe and WithU are minimal at best. According to press reports summarized in a Public Justice Report, the Tribe kept just 1% of the $100 million in revenue generated by MacFarlane Group—a partner brought in to assist with underwriting, software development, marketing, and call center support for two of the Tribe's past online lender

---

[4] https://www.bbb.org/us/ok/oklahoma-city/profile/loans/withu-loans-0995-90092270   (last accessed November 29, 2023).
[5] https://www.bia.gov/service/tribal-leaders-directory/federally-recognized-tribes?field_us_state_s__value=OK&page=1 (last accessed November 29, 2023).

entities. Kyra Taylor, *Stretching the Envelope of Tribal Sovereign Immunity? An Investigation of the Relationships Between Online Payday Lenders and Native American Tribes*, THE PUBLIC JUSTICE FOUNDATION, p. 201 (Nov. 2017); *see id.* at 200-02 (describing the public information available at the time regarding the Otoe-Missouria Tribe and its involvement in payday lending).

33.     Online lenders and other similar entities use this "rent-a-tribe" scheme to avoid state usury laws by invoking the sovereign immunity available to Native American tribes. In general, the scheme is premised on a simple exchange: non-tribal entities and individuals operate nearly all substantive aspects of the lending business, while the tribe is used as a label or a figurehead for a portion of the profits.

34.     A purported tribal entity must show it is an arm of the tribe to avail itself of sovereign immunity protection.

35.     Courts generally utilize the "arm-of-the-tribe" multi-factor test to determine whether a subordinate entity is entitled to share in the Tribe's sovereign immunity. The relevant factors include: "(1) their method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1181 (10th Cir. 2010).

36.     At best, sovereign immunity for an "arm of the tribe" creates a defense to criminal and civil prosecution, but it does not turn an unlawful loan into a legal one. *See, e.g., United States v. Neff*, 787 Fed. Appx. 81, 89 (3d Cir. Sep. 6, 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; "reasonable people would

know that collecting unlawful debt is unlawful"). "[T]he burden of proof should fall to the entity seeking immunity as an arm of the tribe, despite the jurisdictional nature of such immunity." *Easley v. Hummingbird Funds*, No. 19-cv-00937, 2020 WL 5099955, at *4 (S.D. Ala. July 30, 2020) (citing *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019)).

37.     WithU currently operates under a lending license issued on September 1, 2023, by the Otoe-Missouria Consumer Finance Services Regulatory Commission. *See* **Exhibit C**. Beyond such performative acts, the connections between WithU and the Tribe are largely attenuated.

38.     Despite claiming it is "owned and operated" by the Tribe, WithU's website directs correspondence to a UPS mailbox located off tribal land in Oklahoma City.

39.     Even though correspondence is directed elsewhere, WithU lists its office address as 8151 Hwy 177, Red Rock, OK 75651. This address contains a cluster of buildings, including a community center and a cultural center, but no lending operations or business offices seem to be present.

40.     Furthermore, WithU's site configuration for its domain, withuloans.com, is relatively advanced. WithU has several known web-hosting services it utilizes—none of which operate any physical infrastructure in the state of Oklahoma. The original IP address is connected to a google cloud account IP, so not a direct IP, but it is based in Missouri. Additionally, any other third-party professional data center services possibly utilized by WithU, even if in the state of Oklahoma, are not located on Tribal land.[6]

41.     Tellingly, the Otoe-Missouria Tribe's official website does not mention WithU Loans at all, despite having menu options titled "Who We Are" > "Enterprises" > "Financial

---

[6] It is possible that WithU is operating its own servers, but that is unlikely given the upkeep and the technical requirements of running servers in the modern digital environment.

Services" > "Job Opportunities."[7]   This "Job Opportunities" landing page has the following description:

> AWL is wholly owned by the Otoe-Missouria Tribe of Indians, a sovereign nation located within the United States of America. AWL is physically located and operated on the Otoe-Missouria reservation. We have more than 100 people employed at AWL in a number of different departments. As openings occur, they will be posted here. Thank you for your interest.

42.   The "AWL" in the description above likely refers to American Web Loans, another rent-a-tribe scheme at the heart of a multi-million dollar class settlement approved by a federal court in July 2021. *See Solomon v. Am. Web Loan*, ECF No. 496, No. 17-cv-0145 (E.D. Va. 2021).

43.   Plaintiff asserts it is not coincidence that the domain for WithU loans was also registered in 2021.

44.   Virtually none of WithU's business is conducted on the Tribe's reservation.

45.   Business operations conducted off tribal reservation land are conducted by and for non-tribal investors and interested parties.

46.   As noted above, the Tribe has engaged in similar "rent-a-tribe" schemes before. In the class action settlement from *Solomon*, plaintiffs alleged the Tribe had almost no involvement in the loans and received less than 2% of the revenues.

47.   The Tribe was accused of engaging in at least one other rent-a-tribe scheme—in addition to the American Web case—through Great Plains Lending. That case resulted in a common fund class settlement approved by the United States District Court for the Eastern District of Virginia as well as non-monetary relief requiring "Great Plains [to] wind up its business and

---

[7] https://www.omtribe.org/who-we-are/enterprises/financial-services/job-opportunities/   (last accessed November 29, 2023).

9

dissolve pursuant to the Otoe-Missouria Tribe of Indians Limited Liability Company Act." *Gibbs et al. v. Plain Green, LLC et al.*, ECF No. 141, at 7, No. 17-cv-00495 (E.D. Va. 2019).

### C. WithU and Caliber as a Racketeering Enterprise:

48.     Upon information and belief, WithU's predatory lending scheme is facilitated by Caliber, a "professional portfolio management" servicer for "the Tribe's consumer lending portfolios[,]" like WithU. Caliber also claims it is "wholly owned by the Otoe-Missouria Tribe of Indians" and that it is a "tribally-chartered corporation."[8]

49.     Caliber's website advertises its "real-time flexible and transparent fintech solutions." Further, the "Our Services" portion of the site details the company's ability to "grow our partners' portfolio" through "marketing programs . . . used to acquire and retain customers" and "leading edge analytics" that "deliver[s] upper quadrant performance in acquisition, underwriting, servicing and recovery."[9]

50.     In short, Caliber manages the marketing, collection, and underwriting operations for Tribal lenders. On information and belief, Caliber provides those services to WithU.

51.     However, like WithU, Caliber has nominally labeled itself a Tribal entity although it has little to nothing to do with the Otoe-Missouria Tribe. Stating on one's website that "[r]evenues go to support social programs critical to the Tribe's members such as elder care, educational scholarships, after-school programs, public safety, and improvements to housing and infrastructure[]" does not make it so.

52.     Also like WithU, Caliber's business is conducted off Tribal land.

---

[8] https://www.caliberfs.com/about (last accessed November 29, 2023).
[9] https://www.caliberfs.com/our-services (last accessed November 29, 2023).

53.     Caliber's principal place of business is in Overland Park, Kansas. All of the current openings in the "Careers tab of Caliber's website list Overland Park, Kansas as the office location.[10] Indeed, an opening for an administrative assistant position stated applicants must be present in the Overland Park, Kansas office to "support the CEO and other members of the Executive Team." *See* **Exhibit A**.

54.     This presence in the Kansas City metropolitan area is not a coincidence. The area is home to many entities engaging in rent-a-tribe schemes—most infamously Scott Tucker's AMG Services.[11]

55.     WithU and Caliber cannot become arms of the Tribe by simply adding the Otoe-Missouria Tribe's name to its website and nominally chartering themselves under the Tribe's laws.

56.     According to the U.S. Department of Health and Human Services, per capita income for the Tribe in between 2015 and 2019 averaged $13,887 per year. *See* https://www.acf.hhs.gov/sites/default/files/documents/cb/tribal-fmap-reference-fy2022.pdf.

57.     WithU offers loans up to $2,500 to qualified customers—to be delivered to an applicant's bank account as early as the same day of application.

58.     The Tribe does not have the necessary assets to leverage as collateral for the revolving line of credit required to fund an online payday lender. For example, the Operating Agreement for Great Plains Lending, another lending operation affiliated with the Otoe-Missouria Tribe, states that "the Tribe has contributed sufficient capital and resources to allow for the ongoing business of the Company . . . . *It is intended that the Company will operate separately from the Tribe and will not require continuing financial support from the Tribe. However, it may be*

---

[10] https://www.caliberfs.com/careers/openings (last accessed November 29, 2023).
[11] https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday (last accessed November 29, 2023).

*necessary to obtain funding for working capital and/or capital acquisitions by the Company*." *Finn v. Great Plains Lending,* LLC, ECF No. 7-1, Dec. of John Shotton, Ex. D, Operating Agreement of Great Plains Lending, LLC, p. 4, No. 15-cv-04658 (E.D. Pa 2015) (emphasis added).

59.     The Tribe receives only pennies of each dollar, while 98% or more of revenues flow to non-Tribal persons and entities.

60.     On information and belief, the Tribe exerts no control over the enterprise, how it is operated, who it lends to, and so forth. Any tribal involvement does not go beyond the hiring of a handful of Tribal members to work as phone customer service representatives or similar low-level jobs.

61.     Statements from Tribal members now wholly unconnected to the Tribe's past lending companies confirm this strategy:

> Charles Moncooyea, the Vice Chairman when the tribe became involved with the payday industry, told one journalist, "I didn't do much at all [for the payday company], just looked at the checks and passed them on . . . . We were just a pawn." He continued, "All we wanted was money coming into the tribe . . . As time went on, I realized that we didn't have any control at all." Moncooyea confirmed that the tribe received only 1% of the revenue generated by the payday company managed by the MacFarlane group.

Kyra Taylor, *Stretching the Envelope of Tribal Sovereign Immunity? An Investigation of the Relationships Between Online Payday Lenders and Native American Tribes*, The Public Justice Foundation, p. 202 (Nov. 2017) (alterations in original) (quoting Zeke Faux, *Behind 700% Loans, Profits Flow Through Red Rock to Wall Street*, BLOOMBERG TECH., Nov. 24, 2014, http://www.bloomberg.com/news/articles/2014-11-24/payday-loan-fortune-backed-by-medley-found-behind-indian-casino).

62.     WithU, Caliber, and the various non-tribal actors that fund and manage this current operation, work together with the intent to issue usurious loans in Florida. This online lending enterprise functions to benefit individuals and entities that are not affiliated with the Tribe.

**D. WithU's Unenforceable Choice-of-Law, Arbitration, and Class Action Waiver Provisions:**

63.     To start the loan application process, an applicant must agree that WithU's Terms of Use and Privacy Policy apply (collectively, the "Terms").

64.     WithU's Terms contain several unenforceable provisions—designed to circumvent consumer protection laws and prevent customers from aggregating disputes—that violate public policy.

65.     The arbitration agreement in WithU's Terms states: "Law Governing: This Arbitration Agreement is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and the law applicable in arbitration is Applicable Law, as that term is defined in Section 16 below." Section 16 of the terms provides as follows: "Choice of Law; Jurisdiction and Venue: These Terms of Use shall be governed by Tribal Law and applicable federal law (collectively 'Applicable Law'). The term 'Tribal Law' means any law, ordinance or regulation duly enacted by the Tribe or the Otoe-Missouria Consumer Finance Services Commission."[12]

66.     WithU attempts to avoid all state usury laws with these term provisions, and the arbitration agreement is therefore unenforceable.

67.     Moreover, WithU's Terms include a "Waiver of Class Actions," which is unenforceable as well because it is pervasive within the arbitration agreement and contravenes public policy.

---

[12] https://www.withuloans.com/terms (last accessed November 29, 2023).

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class").

69.     Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All individuals identified as Florida residents in WithU Loan agreements where the last installment became due and payable within two years of the filing of this Complaint.

70.     The requirements for maintaining this action as a class action are satisfied.

71.     **Numerosity**. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of the Class members is currently unknown to Plaintiff at this time, upon information and belief, there are likely hundreds of members of the proposed Class.

72.     The number of Class members is known by Defendants, however, and thus may be notified of the pendency of this action by first class mail, electronic mail, or published notice.

73.     **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.   Whether WithU issues loans with per annum interest rates exceeding 18%;

b.   Whether WithU issues loans with per annum interest rates exceeding 45%;

c.   Whether WithU's conduct was knowing and/or willful;

d.   Whether WithU and Caliber engaged in unfair and deceptive practices while conducting its lending businesses;

e.   Whether WithU and Caliber conspired together in an unlawful enterprise designed to collect unlawful debts;

14

f. Whether the Tribe is being used as a front by non-tribal actors in order to obtain the appearance of tribal immunity;

g. Whether the arbitration clause and class action waiver located in WithU's terms of service are valid and enforceable;

h. Whether the Class members are entitled to declaratory and injunctive relief;

i. Whether the Class members suffered legally cognizable damages as a result of WithU and Caliber's unlawful conduct;

j. Whether the Class members are entitled to treble damages, civil penalties, and/or punitive damages.

74. **Typicality**. Plaintiff's claims are typical of those for other Class members in that Defendants deceived and took advantage of Plaintiff in the very same manner that they did each of the other Class members. Plaintiff's interests are consistent with those of the other proposed Class members.

75. **Adequacy of the Representation**. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's counsel are competent and experienced in litigating class actions.

76. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members. The common issues arising from Defendants' conduct affecting Class Members, as described above, predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

77. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class

members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

78.     Defendants WithU and Caliber have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.


## CLAIMS FOR RELIEF

### COUNT I:
Violations of Florida's Usury Statute by WithU (Individual and Class Claim)

79.     Plaintiff adopts and incorporates Paragraphs 1-78 of the above-stated allegations as if fully alleged herein.

80.     Ms. Spigner's Loan violates Florida's usury statute. Under Florida law, the loan is a definitional "usurious contract." Fla. Stat. § 687.02(1) ("All contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a *higher rate of interest than the equivalent of 18 percent per annum simple interest* are hereby declared usurious.") (emphasis added); *see also* Fla. Stat. § 687.03 (declaring loans usurious and unlawful "whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received, together with interest at the rate of the equivalent of 18 percent per annum simple interest").

81.     The per annum interest rate on Ms. Spigner's Loan, approximately 379%, was well over the 18% allowed under Florida law. Therefore, pursuant to Fla. Stat. § 687.04, WithU must "forfeit the entire interest so charged, or contracted to be charged[,]" and Plaintiff is entitled to recover "double the amount of interest so reserved, taken, or exacted."

82.     WithU also violated Fla. Stat. § 687.071, which governs "[c]riminal usury" and "loan sharking." Under the statute, "any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 45 percent per annum or the equivalent rate for a longer or shorter period of time, whether directly or indirectly or conspire so to do, commits a felony of the third degree[.]" *Id.* § 687.071(3). WithU's Loan to Ms. Spigner constituted a criminal act. The statute provides further that "[n]o extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state." *Id.* § 687.071(7).

83.     Plaintiff respectfully requests a declaration that Ms. Spigner's Loan, and all loans deemed part of the Class, are void and unenforceable.

84.     Based on Ms. Spigner's $600 loan amount, her "finance charge" of $1,708.37, and her annual percentage rate of 498.63%, the per annum interest rate for her Loan is approximately 379%.

85.     Such a rate, and WithU's intent to bypass state protections against this type of transaction, violates the civil usury statute and meets the definition for criminal usury under Florida law.

86.     Any amount paid on this unlawful loan constitutes unjust enrichment.

87.     As a direct and proximate result of WithU's usurious lending, Ms. Spigner has been injured and is entitled to an award of monetary damages and declaratory and injunctive relief.

**COUNT II:**

Violations of the Florida Deceptive and Unfair Trade Practices Act by WithU and Caliber
(Individual and Class Claim)

88.     Plaintiff adopts and incorporates Paragraphs 1-78 of the above-stated allegations as if fully alleged herein.

89.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") must be "construed liberally . . . [t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

90.     Under the FDUTPA, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *Id.* § 501.204(1).

91.     "A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 167 (Fla. D.C.A. 2015) (quoting *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009)).

92.     For purposes of the FDUTPA, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Webber v. Bactes Imaging Solutions, Inc.*, 295 So. 3d 841, 844 (Fla. D.C.A. 2020) (cleaned up). As for deceptive acts, an objective test is used to determine whether "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (cleaned up).

93.     WithU and Caliber engaged in unfair and deceptive practices.

18

94.     WithU's loan agreements lock vulnerable consumers in need of money into usurious rates while simultaneously forcing them to disclaim all protections afforded by applicable state laws. Caliber supports and reinforces this unfair practice by providing marketing, collection, and underwriting services.

95.     Further, WithU's unenforceable arbitration agreement that disclaims state law protections is tied to a class action waiver that violates public policy under Florida law.

96.     WithU preys on Florida consumers with the understanding that its business model will inevitably bring on legal scrutiny. It is calculated into the "rent-a-tribe" business model that a lawsuit may arise, and then the Tribe closes shop with one online lender just to start another. In recent years, the Otoe-Missouria Tribe has also been affiliated with other online lenders such as Great Plains Lending, American Web Loan, and Clear Creek Lending.[13]

97.     Ms. Spigner's Loan tied her to these unfair and deceptive practices in exchange for $600. Over the past year, she has made payments to fulfill what WithU calls her "Finance Charge" or "[t]he dollar amount the credit will cost [her,]" which totals $1,708.37. **Exhibit B.**

98.     As a direct and proximate result of WithU and Caliber's violation of the FDUTPA, Plaintiff has been injured and is entitled to an award of monetary damages. Under the FDUTPA, Plaintiff is entitled to recover damages, attorneys' fees, court costs, declaratory and injunctive relief, and a civil penalty of not more than $10,000 for each violation. Fla. Stat. § 501.2075, 501.2105, 501.211.

99.     Moreover, "[t]he remedies of this part are in addition to remedies otherwise available for the same conduct under state or local law." *Id.* § 501.213.

---

[13] Kyra Taylor & Leslie Bailey Victoria W. Ni, THE PUBLIC JUSTICE FOUNDATION, *Stretching the Envelope of Tribal Sovereign Immunity? An Investigation of the Relationships Between Online Payday Lenders and Native American Tribes* (Nov. 2017).

**COUNT III:**

Violations of the Racketeer Influenced and Corrupt Organization Act by WithU and Caliber
18 U.S.C. § 1962(c) (Individual and Class Claim)

100.    Plaintiff adopts and incorporates Paragraphs 1-78 of the above-stated allegations as if fully alleged herein.

101.    Defendants WithU and Caliber are corporate entities and persons as defined by 18 U.S.C. § 1961(3)—and therefore, they are within the scope of 18 U.S.C. § 1962(c).

102.    An "unlawful debt" is a debt "incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6)

103.    It is unlawful, pursuant to § 1962(c) of the RICO Act, for any person employed or associated with an enterprise engaged in activities affecting interstate commerce to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt."

104.    WithU and Caliber, along with other non-tribal actors, are a group of associated individuals, but they are not a single entity.

105.    As alleged above, Caliber offers marketing, collection, and underwriting support for various tribal Lenders including WithU. In return, WithU provides minimal customer-support resources and most importantly, the inaccurate perception of tribal immunity. Persons and entities associated with this "rent-a-tribe" scheme work toward a common goal of issuing usurious loans that unfairly prey on residents of Florida and violate State law.

106.    The usurious lending scheme engages in and affects interstate commerce. It results in Florida consumers being lured into predatory loans with interest rates that exceed twice the prohibited rate in Florida. The enterprise exists for the purpose of collecting unlawful debts.

107.    Because Defendants WithU and Caliber participate in this enterprise that violates the RICO statute, they are liable for treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and members of the proposed Class, prays for the following relief:

a.  That this action be certified as a class action, establishing the Class and any subclasses the Court may deem appropriate;

b.  Appointing Plaintiff and her Counsel to represent the Class;

c.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

d.  For declaratory, injunctive, and other equitable relief as permitted by law, including enjoining Defendants from continuing the unlawful practices described in this Complaint;

e.  For an award of punitive damages, as allowable by law;

f.  For an award of attorneys' fees and costs;

g.  Pre-judgment and post-judgment interest on any amounts awarded; and

h.  Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: November 30, 2023.                    Respectfully submitted,

BY: /s/ *Scott C. Harris*
Scott C. Harris
FL Bar No.: 103905
Karl J. Amelchenko*
Eric G. Steber*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile: 919-600-5035
Emails: sharris@milberg.com;
kamelchenko@milberg.com; esteber@milberg.com

**Pro Hac Vice* Applications Forthcoming

*Attorneys for Plaintiff*

EXHIBIT A



CONTACT US    CAREERS

# Current Openings

Job Title: Executive Administrative Assistant
Department: Executive
Reports To: CEO
Position location: This role is required to be in the office in Overland Park, KS Tue-Thu on a weekly basis

Summary The Executive Administrative Assistant provides high-level administrative support to the CEO and other members of the Executive Team. The Executive Administrative Assistant assists with the corporate travel program, prepares reports, plans meetings for the CEO and executive team as requested, performs clerical functions, establishes relationships with outside vendors and consultants. Performs other assignments and duties as required.

Responsibilities

Coordinate all travel arrangements for the CEO, Executive level employees, Tribal members, and company guests as requested.  Travel may include but not be limited to flights, hotels, and ground transportation. Maintains communication with outside travel partners as necessary.

Assists with the management of the CEO's calendar which may require interaction with both internal and external individuals and/or groups as well as consultants.  Coordinate schedules and make appointments as requested.

Assists with organizing aspects of company events and meetings as requested /required by the CEO or the Executive team. Coordinate and arrange required meetings, prepare agendas, reserve catering, prepare facilities, ensure all meeting requirements are met.

# EXHIBIT B

## LOAN AGREEMENT

Loan Date: 1/26/2023

Loan #: 553785

Due Date: 2/2/2023

W6LS, Inc.
10600 S. Pennsylvania Ave.
Suite 16 #828
Oklahoma City, OK 73170-4257

NAME:   Inez Spigner
ADDRESS:
PHONE:

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 498.63% | $1,708.37 | $600.00 | $2,308.37 |

Your Payment Schedule will be:

# EXHIBIT C



THIS CERTIFIES THAT

# W6LS, Inc.

License Number # OMCFSRC-23-02 Issued on September 1, 2023 and expiring on August 31, 2025

IS LICENSED BY THE OTOE-MISSOURIA CONSUMER FINANCE SERVICES REGULATORY COMMISSION

DARRELL KIHEGA, CHAIRMAN